2002 SD 54

**In the Matter of the GUARDIANSHIP of T.L.R. and Concerning Johnny E. Ross, Father.**

**No. 21913.**

Supreme Court of South Dakota.

Argued Nov. 15, 2001.

Decided May 8, 2002.

John J. Delaney, Rapid City, South Dakota, for appellant, Guardians, Linda and Alvin Span.

Suzanne Dardis of Hood & Nies, P.C., Spearfish, South Dakota, for appellee, Father, Johnny E. Ross.

GORS, Acting Justice.

[¶ 1.] Alvin and Linda Span appeal from an order terminating their guardianship of T.L.R. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] T.L.R. was born on August 27, 1996, to Johnny Ross (Johnny) and Jamie Lynn Span (Jamie). The couple never married. Johnny and Jamie had a son born prior to T.L.R. in August of 1995. However, this son died eight days after his birth. Both parents were devastated and both began to abuse alcohol. In January of 1997, when T.L.R. was five months old, Jamie and Johnny separated. They agreed that Jamie would have physical custody of T.L.R., while Johnny would have regular visitation.

[¶ 3.] Jamie and T.L.R. moved in with Jamie's parents, Linda and Alvin Span (Spans). In late February, Jamie relocated to an apartment. Unknown to Johnny, Jamie left T.L.R. with the Spans. Within two months, Jamie left town without telling anyone where she was going. T.L.R. remained with the Spans.

[¶ 4.] On April 3, 1997, the Spans instituted a guardianship proceeding with a hearing scheduled for April 18th. There was a dispute whether notice was properly served on Johnny, and he did not appear at the hearing. At the hearing, the trial court appointed Spans as guardians of T.L.R. Later, Johnny obtained counsel and filed a petition on May 5th to remove the Spans as guardians, to terminate the guardianship and to grant custody to Johnny. He presented evidence at the hearing on May 22nd that Jamie stole the notice of the guardianship proceeding out of his mailbox. The trial court declined to rule on this issue and instead ordered that Spans remain guardians, subject to specific visitation rights to Johnny. The trial court also ordered a home study to be conducted on both parties.

[¶ 5.] Subsequently, Tom Collins (Collins), an administrator for Child Protection Services, conducted a child custody study. Collins recommended that the guardianship be continued, subject to a visitation schedule that would assist in a transition of T.L.R. from Spans' care to Johnny. Collins suggested that the court schedule a review hearing after one year to review the placement of T.L.R. in Johnny's care.

[¶ 6.] After a year had passed, Johnny pursued the custody of his son and filed a petition to remove and terminate the guardianship and determine custody on August 12, 1998. Collins completed a child custody update on November 13th "strongly" recommending that T.L.R. be returned to his parents' care, with Johnny as the primary caregiver.

[¶ 7.] On December 1, 1998, the trial court terminated the guardianship of the Spans and granted legal custody to Johnny. The trial court also ordered that Johnny not consume any alcohol while T.L.R. was in his custody. On December 23rd, however, the trial court vacated the order terminating guardianship and granting custody to Johnny. In a new order, the trial court set out additional requirements that Johnny had to meet before custody would be returned to him.

[¶ 8.] On January 21, 1999, Johnny made a motion for a transitional plan whereby T.L.R.'s physical custody would gradually transfer to Johnny. The Spans, however, reported to the trial court that a child psychologist they had personally hired, Lee Pfeiffer (Pfeiffer), believed that overnight visits should be suspended and T.L.R. should stay with the Spans until he was four years old.[1] On February 23, 1999, both Johnny and Jamie signed a stipulation that they had withdrawn their motions to terminate guardianship and to

---

1. Pfeiffer interviewed only Linda Span and observed T.L.R. with Linda. Pfeiffer did not interview Johnny or observe T.L.R. with Johnny.

gain custody of T.L.R., subject to the right of either Johnny or Jamie to petition the court for termination of the guardianship at some future date.

[¶ 9.] On July 28, 2000, Johnny filed a motion to terminate the guardianship, and trial was set for January 11, 2001. On September 7, 2000, Pfeiffer met with Johnny and T.L.R. Pfeiffer agreed with Collins that T.L.R. should be returned to the care and custody of his biological parents "on a transitional basis." At trial, both Collins and Pfeiffer testified that primary custody should be vested with Johnny. The trial court ordered the guardianship to be terminated, that Johnny and Jamie share joint legal custody, and that Johnny receive primary physical custody, subject to visitation rights of Jamie and Spans. Johnny was ordered to submit to a drug and alcohol evaluation within thirty days. Johnny was evaluated on January 29, 2001, and the drug and alcohol counselor concluded, "[b]ased on the evaluation and oral interview, Mr. Ross *does not* meet the criteria for alcohol/drug abuse or dependency." (emphasis in original).

[¶ 10.] The trial court signed an order terminating guardianship and placing primary physical custody with Johnny on March 23, 2001. The trial court also ordered that Johnny "neither possess nor consume alcohol, regardless of whether [T.L.R.] is with him ...." The Spans appeal on the following issue: is a showing of substantial change in circumstances required prior to the termination of a guardianship?

## STANDARD OF REVIEW

[¶ 11.] This Court reviews a trial court's factual determinations under the clearly erroneous standard. *Therkildsen v. Fisher Beverage,* 1996 SD 39, 545

N.W.2d 834, 836. We recently described our review surrounding statutory interpretation as follows:

> Questions of law such as statutory interpretation are reviewed by the Court de novo.... The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the Court thinks it should have said, and the Court must confine itself to the language used. Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed. Since statutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject.

*Cromwell v. Rapid City Police Dep't,* 2001 SD 100, ¶ 9, 632 N.W.2d 20, 23 (citing *Lekanidis v. Bendetti,* 2000 SD 86, ¶ 16, 613 N.W.2d 542, 545).

## ANALYSIS AND DECISION

[¶ 12.] Pursuant to SDCL 29A-5-506, a trial court may terminate a guardianship if it "determines that the minor is no longer in need of the assistance or protection of a guardian ...." The Spans argue that Johnny must prove that a material and substantial change of circumstances has occurred before the guardianship is terminated. The Spans compare a termination of a guardianship to a modification proceeding in a parental custody dispute pursuant to SDCL 25-4-45.[2] Although that

---

2. SDCL 25-4-45 provides, *inter alia,* that

"[i]n an action for divorce, the court may,

statute does not expressly require a substantial change in circumstances, it has long been the rule in South Dakota that, to modify a custody decree rendered after a contested hearing, the moving party must show a substantial change in circumstances. *See Price v. Price*, 2000 SD 64, ¶ 52, 611 N.W.2d 425, 436; *Fuerstenberg v. Fuerstenberg*, 1999 SD 35, ¶ 33, 591 N.W.2d 798, 810; *Kappenman v. Kappenman*, 523 N.W.2d 410, 413 (S.D.1994); *Andersen v. Andersen*, 399 N.W.2d 363, 365 (S.D.1987); *Mayer v. Mayer*, 397 N.W.2d 638, 640 (S.D.1986); *Masek v. Masek*, 90 S.D. 1, 5, 237 N.W.2d 432, 434 (1976) [Masek II]. This requirement shields children and parents from the incalculable detriment caused by "endless and vexatious litigation[.]" *Masek II*, 90 S.D. at 6, 237 N.W.2d at 434.

 [¶ 13.] In legal contests between a parent and a nonparent for the custody of a child, the threshold question becomes: "Is the parent unfit to have custody of the child?" *Matter of Guardianship of Sedelmeier*, 491 N.W.2d 86, 87 (S.D.1992). The parents' right to custody over their own children should never be disturbed except upon a clear showing against the parent of "gross misconduct or unfitness, or of other extraordinary circumstances affecting the welfare of the child." *Id.* at 88. In *Fuerstenberg*, 1999 SD 35 at ¶ 24, 591 N.W.2d at 807, we stated:

> Some of the factors important to the fitness question are: (1) mental and physical health; (2) capacity and disposition to provide the child with protection, food, clothing, medical care, and other basic needs; (3) ability to give the child love, affection, guidance, education and to impart the family's religion or creed;

(4) willingness to maturely encourage and provide frequent and meaningful contact between the child and the other parent; (5) commitment to prepare the child for responsible adulthood, as well as to insure that the child experiences a fulfilling childhood; and (6) exemplary modeling so that the child witnesses firsthand what it means to be a good parent, a loving spouse, and a responsible citizen.

(internal citations omitted). After reviewing these factors in *Fuerstenberg*, the trial court found Johnny to be a fit parent.

[¶ 14.] Since the oral arguments in this case, this Court decided *Meldrum v. Novotny*, 2002 SD 15, 640 N.W.2d 460. In *Meldrum*, a majority of this Court held that even though the natural parent was fit, the trial court should look at the best interests of the child in determining whether an unrelated third party should have custody. Chief Justice Gilbertson and Justice Konenkamp agreed that when extraordinary circumstances exist, the trial court should look at the best interests of the child. *Id.* at ¶ 39 and ¶ 60, 640 N.W.2d at 466 and 471. Justice Amundson joined and wrote that the best interests of the child should always be the paramount concern. *Id.* at ¶ 63, 640 N.W.2d at 472.

[¶ 15.] The Spans argue that it is in the best interests of T.L.R. to be in their custody. Both Collins and Pfeiffer testified, however, that it would be in T.L.R.'s best interest to be returned to the custody of Johnny on a transitional basis. Based on the evidence, the trial court concluded that it was in T.L.R.'s best interests "that transition of custody" be made into Johnny's home.

[¶ 16.] As the trial court found, the guardianship was granted in large part

before or after judgment, give such direction for the custody, care, and education of the children of the marriage as may seem neces-

sary or proper, and may at any time vacate or modify the same."

due the immaturity of T.L.R.'s parents. It is undisputed that Johnny has a history of alcohol abuse. The trial court had previously ordered Johnny not to drink alcohol in T.L.R.'s presence, and then later ordered him that he could not drink alcohol at all. In its findings, the trial court acknowledged that Johnny had lied to the court about his drinking on prior occasions. The trial court also found, however, that Johnny demonstrated that he is able to assume the physical custody and responsibility of T.L.R. Further, Collins stated in his evaluation of Johnny in January of 2001, that Johnny was no longer dependent on alcohol.

[¶ 17.] Currently, Johnny has a home established with a new wife and their child. Both Johnny and his new wife have completed parenting classes. Johnny also has stable employment and has shown a desire to raise T.L.R. He has shown, pursuant to SDCL 29A–5–506, that T.L.R. is no longer in need of Spans' guardianship.

[¶ 18.] In conclusion, Johnny was not required to show a substantial and material change of circumstances to terminate Spans' guardianship of T.L.R. By their very nature, guardianships are temporary. The ultimate standard that should guide trial courts in deciding whether to terminate a guardianship in favor of a natural parent is the best interests of the child. When deciding whether to terminate a guardianship and to return a child to a natural parent, we adopt the following three-step analysis:

First, is the parent seeking to terminate the guardianship fit? If the parent is not fit, then the guardianship should not be terminated. If the parent is fit, then the trial court should advance to the second step in the analysis.

Second, are there extraordinary circumstances? If there are no extraordinary circumstances, then it is in the best interest of the child to be returned to the natural parent and the guardianship should be terminated. If there are extraordinary circumstances, then the trial court should advance to the third step in the analysis.

Third, what is in the best interest of the child? If it is in the best interest of the child to be returned to the natural parent then the guardianship should be terminated. If it is in the best interest of the child to remain with the guardian, then the child should not be returned to the natural parent and the guardianship should continue.

## ATTORNEY'S FEES

[¶ 19.] Johnny has filed a motion for $4,569.26 in appellate attorney fees. Appellate attorney fees may be granted "in actions where such fees are allowable . . . ." SDCL 15–26A–87.3. In general, the compensation of attorneys is left to the express or implied agreement of the parties. SDCL 15–17–38. However, the court "may award payment of attorneys' fees in all cases of divorce, annulment of marriage, determination of paternity, separate maintenance, support or alimony." SDCL 15–17–38. This case does not fall within these categories and the motion for attorney fees is denied.

[¶ 20.] The judgment is affirmed.

[¶ 21.] GILBERTSON, Chief Justice, and SABERS, AMUNDSON and KONENKAMP, Justices, concur.

[¶ 22.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.